THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. RAMÓN CRUZ REYES, Defendant and Appellant.

No. 8893. Argued February 18, 1942.—Decided March 12, 1942.

114

*Juan Valldejuli* and *R. Hernández Matos* for appellant. *George A. Malcolm, Attorney General, R. A. Gómez, Prosecuting Attorney,* and *Luis Negrón Fernández, Assistant Prosecuting Attorney,* for appellee.

MR. JUSTICE DE JESÚS delivered the opinion of the court.

This is an appeal from a judgment sentencing the appellant to seventeen years' imprisonment in the penitentiary after having been convicted of murder in the second degree for the killing of Rafael Igaravídez, District Chief of Police of Ponce.

■ The first assignment of error is based on the refusal of the trial court to postpone the trial on account of the illness of the attorneys of record, R. Martínez Nadal, Esq., and José R. Gelpí, Esq. The motion for a continuance was filed on the same day when the case was to be called for trial, November 25, 1940, and the record shows that the crime charged against the accused had been committed on June 29, 1938; that the case was first set for trial on April 24, 1939; and that from the latter date until November 25, 1940, three continuances had been ordered, all on identical grounds and on motion of the accused, one year and seven months having thus elapsed from the date the trial was set for the first time until the time when the fourth continuance was sought. In these circumstances, we fail to see how it can be validly maintained that the court abused its discretion in refusing a fourth continuance. The granting of such motion would have constituted a clear abuse of discretion.

■■ The second error assigned is that on the day set for the trial and before the case was called for trial, the court, in the absence of the accused, excused 13 of the jurors who had been summoned to try the case. The fact that the court, properly or improperly using its discretion, had excused 13 of the jurors summoned to try the case under the above circumstances would not justify at all a reversal of the judgment rendered. An accused has no vested right to be tried by certain persons in particular, and the excusing of a juror from jury duty in a case rests in the sound discretion of the court. In the case at bar the persons who were excused adduced legal grounds therefor, and, as stated by the court, most of them were federal or insular employees. The better practice, however, is to grant such excuses in open court, in the presence of the parties and of the other jurors who have been summoned, so that everyone can hear the grounds on which they have been excused, thus preventing those who are not excused from thinking that they have been discriminated against.

■ The third error assigned is that Attorney F. Colón Díaz was not allowed by the court to serve as counsel for the defendant. While the eleventh witness for the prosecution was on the stand, Attorney Valdejulli, on behalf of the defendant, moved the court to admit Attorney F. Colón Díaz as one of the attorneys of record for the defendant. The district attorney objected and the court, in view of the fact that the jury had been impaneled on the basis that the only attorneys for the defendant would be Attorneys Hernández Matos and Valldejuli, and bearing in mind that, as some of the jurors who had been impaneled the day before might be clients of Attorney Colón Díaz or related to him by blood or otherwise, and might have been challenged by the district attorney either for cause or peremptorily, denied the motion, because the admission of Attorney Colón Díaz as counsel for the defendant at that stage of the proceedings would deprive the district attorney of such right. Under such circumstances, the court made proper use of its discretion in denying the motion.

■ The fourth assignment is that, according to the defendant, the district attorney, in his opening statement to the jury commented upon the reputation of the accused. At the time of the crime, the defendant was a policeman stationed in Ponce under Chief Igaravídez. In his address to the jury the district attorney stated that the crime in question was brought about by the insubordination and undisciplined character of the accused. The presumption of innocence recognized by law in favor of every accused precludes the introduction of evidence regarding his bad reputation or character. However, the reputation or character of an individual is not the same thing as his conduct in connection with the crime with which he is charged. Any crime *malum in se* necessarily implies a wrongful act, and where such act forms part of the crime charged or tends to show the motive which led to its commission, the same is quite admis-

sible in evidence, and hence reference can be made thereto when stating the case to the jury. See *People* v. *González,* 57 P.R.R. 729.

■ The seventh assignment relates to the admission in evidence, according to the defendant, of the statement of charges preferred by the deceased against the accused and to which the district attorney alluded when in his statement of the case he told the jury that he intended to show that the motive for the crime had been the bad conduct or lack of restraint on the part of the accused. In this respect the district attorney introduced in evidence a statement of charges brought against the accused, signed by Chief Igaravídez on the day of the crime—June 29, 1938. The signature of Igaravídez was sufficiently identified by the witness Salvador G. López de Azúa. The signature of the accused, which was also affixed to the statement of charges, was not identified. Undoubtedly, accused's signature was needed in order to show that he knew of the charges brought against him, and hence that said statement of charges might possibly have influenced his mind in connection with the commission of the crime. However, as it appears from page 355 *et seq.* of the transcript of the evidence that the accused himself, when examined by his attorneys, testified that at 6 p. m. on the day of the crime he had been advised of said charges, the omission in the evidence, with respect to the identification of his signature, was supplied. That being so, it was not error for the trial court to admit such document in evidence.

■ Let us take up now the fifth error assigned. It relates to the view taken, during which, as claimed by the appellant, the jury heard evidence in the absence of the defendant and of his counsel.

At the close of the direct evidence for the prosecution, the district attorney asked the court to order that a view be taken of the place of the crime. The defendant objected on

the ground that it was unnecessary. One of the government attorneys insisted, whereupon the court said that it would submit the question to the jury for their decision, that is, that it would grant the motion if the jury deemed the view necessary. As the latter expressed their desire to inspect the place in question the motion was granted and the view taken at the close of the direct evidence for the defense.

Before considering the report of the view taken in the instant case, it is well that we should properly fix the true scope of a view in the light of the applicable provisions of law and of the decisions, so as to determine then whether the view taken in the case at bar exceeded the limits of such a scope and, if so, whether the substantial rights of the accused were prejudiced thereby to such an extent as to require a reversal of the judgment. Let us first consider the applicable law, which is § 258 of the Code of Criminal Procedure that textually reads as follows:

"Section 258.—*When, in the opinion of the court,* it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, it may order the jury to be conducted in a body, in the custody of an officer to the place, which must be shown to them by a person appointed by the court for that purpose; *and such officer must be sworn to suffer no person to speak or communicate with the jury nor to do so himself, on any subject connected with the trial,* and to return them into court without unnecessary delay, or at a specified time." (Italics ours.)

The purpose of a view is to aid the jury or the judge, as the case may be, in weighing correctly the evidence already received or which may subsequently be introduced. In certain cases a view, far from aiding, might introduce confusion and even lead the court into error. Hence, the law has left it to the sound discretion of the judge to determine in each case whether or not a view should be granted, and such power should not be delegated to the jury or to any other officer. In exercising his discretion the judge should

first ascertain whether a view is needed for a better weighing of the evidence or of any question of fact that might arise. If a view is necessary, he must make sure that the place or object to be viewed is substantially in the same condition as it was when the crime was committed, for any substantial alteration of the place or objects would necessarily frustrate the purpose of the view. As we have seen, our statute leaves to the discretion of the judge the appointment of a person to show the place to the jury. The better practice, however, is for the judge to accompany the jury to the place to be viewed. In this way he will be able not only to conduct the procedure to be followed during the view and prevent the commission of any act that might lead to a mistrial, but also to place himself in a position to draw up a report of the result of the view, so that there should appear in an authentic way the proceedings had therein, and which will enable an appellate court to pass on any question that might arise regarding the validity of such proceedings. Counsel for both parties should also be present in order to indicate or point out to the jury the various places, objects, or distances sought to be viewed, avoiding, of course, any discussion or comments regarding the case. This does not mean that a witness designated by the court, as happened in this case, when illustrating his own testimony, should be prevented from pointing out on the spot the respective positions of the accused and of his victim, and from graphically describing the position in which the victim lay, as the witness might have done on a piece of paper or on the blackboard in the courtroom.

In *Snyder* v. *Massachusetts*, (1934), 291 U. S. 97, 78 L. ed. 674, 90 A.L.R. 575, Mr. Justice Cardozo resumed in the following language the practice which since early times has been followed in connection with views:

"As early as 1747 there is the record of a precedent that exhibits the remedy in action. The practice then was to place the jury in

the charge of 'showers,' who were sworn to lead them to the view. . .
At that time views were not taken in criminal cases without the
consent of both the parties, the Crown as well as the defendant, except,
it seems, upon indictments for maintaining a nuisance. (Citing au-
thorities.) In 1825, however, a statute applicable to England and
Wales supplied the defect of power, if defect there formerly had been.
6 George IV, c. 50, s. 23. Thereafter, in any case, 'either civil or
criminal,' a view might be ordered in the discretion of the court.
The form of oath administered to the showers appears in the reports.
Thus, in *Regina* v. *Whalley*, 1847, 2 Cox Crim. Rep. 231, the oath
administered was this: 'You swear you will attend this jury and
well and truly point out to them the place in which the offense for
which the prisoner T. W. stands charged is alleged to have been
committed; you shall not speak to them touching the supposed of-
fence whereof the said T. W. is so charged, only so far as relates
to describing the place aforesaid.' (Citing authorities.) So also in
our own country, the power to order a view in criminal cases has been
made certain by statutes enacted in nearly all the states (see the
statutes collated in Wigmore on Evidence, vol. 2, §1163), though
there are instances in which the power has been treated as inherent.
(Citing authorities.) The statutes, when enacted, conform very
generally to the practice in the English courts, provision being made
for the presence of the judge, or, in his discretion, for the appoint-
ment of showers sworn in the ancient form. Cf. the statutes and
decisions in Wigmore, Evidence, vol. 3, §§1802, 1803, and vol 2,
§1163; and see *Brooklyn* v. *Patchen*, 8 Wend. 47, 65; *State* v. *Perry*,
*supra*, at p. 536.''

Let us consider now the ocular inspection as actually
made in the case at bar. As the report on the view is com-
paratively short, for the sake of accuracy, we will textually
transcribe it below:

VIEW

''JUDGE:

''In Ponce, Puerto Rico, on this 27th day of November, 1940, at
12:12 p. m., there met in front of Droguería 'Royal' located at the
corner of Muñoz Rivera Square and Isabel Street of this city of
Ponce, the presiding judge herein, Carlos Suárez, clerk, Justo M.
Dodón, stenographer, District Attorneys Pedro Rodríguez Serra, Esq.,
and Guillermo Pierluisi, Esq., and the gentlemen of the jury trying
the present case all pursuant to the request made by said jury to
be brought to this place in order to take a proper view, such request

of the jury having been made in open court in the presence of defendant Ramón Cruz Reyes and his counsel, Attorneys J. Valldejuli Rodríguez and Rafael Hernández Matos, who were advised by the court to appear together with the accused, no objection thereto having been made, this court so constituted having waited in this place for twenty minutes during which time the traffic was stopped.

"The Court records the fact that after the lapse of 20 minutes without either of the attorneys for the defendant or said defendant having appeared, the marshal Morales and the deputy marshal Figueroa, who were present, were directed to call the attorneys on the telephone and that Attorney Hernández Matos was located in his office but said that he did not desire to appear, and that Attorney Valldejuli had withdrawn with the accused.

"DEPUTY MARSHAL FIGUEROA:

"Attorney Hernández Matos stated to me that Attorney Valldejuly would come to attend the view.

"The court records the fact that it saw the accused passing by in an automobile while we were at the corner.

"TESTIMONY OF PORFIRIO RODRÍGUEZ:

(His oath is administered by the judge.)

"JUDGE:

"What is your name?—WITNESS: Porfirio Díaz—What is your occupation?—Policeman.—Where were you, just now at 12.15?—At the corner of Farmacia Royal.—Do you know Ramón Cruz Reyes, the defendant in this case?—By sight.—Have you seen lately defendant Ramón Cruz Reyes and his attorneys?—I saw Ramón Cruz Reyes driving a car, accompanied by one of the attorneys.—At what time?—Just a moment ago.—In view of that, the court is going to call the names of jurors so as to comply with the law. (The Judge calls the names of the jurors who were all present.)—JUDGE: As this is the time for taking the view, and as the appearance of witness Jorge Brandon was requested by the jury and granted by the court, let him be sworn in. (Brandon is sworn by the Judge himself.) The gentlemen of the jury may now view the place with witness Brandon.—JUROR JOAQUÍN MARTÍNEZ ANDINO: Mr. Brandon, where were you when the event took place?—Just under those palms, between the two palms in sight, facing the telephone booth. Under that palm, the first one.—Will you go and stand at the spot where you were?—Yes, sir.—JUDGE: Stand up at the spot where you were. (Mr. Brandon stands up at the spot pointed out by him previously.)

'—JUDGE: The fact is recorded that the witness stands up approximately near the first palm, on the north side, with a foot resting on a railing about one foot and a half high, the witness looking towards Parque de Bombas.—MR. BRANDON: I was standing here and policeman Miguel Angel Ríos here. I assumed this posture.—JUDGE: Were you standing there?—I had my right foot resting on one of the small fence boards of the garden, looking towards Parque de Bombas. I heard a shot, looked instinctively towards the place, and saw Captain Igaravídez as he fell.—JUROR SEGUNDO CASTRO: Where did he fall?—MR. BRANDON: I saw Captain Igaravídez on this place and the aggressor here.—JUDGE: Captain Igaravídez, on the sidewalk of Farmacia Royal, at the corner facing Plaza Muñoz Rivera?— Yes, sir, and the policeman stood thus.—On the south side looking north?—Yes, sir.—And Captain Igaravídez?—From north to south.—When I heard the shot, Captain Igaravídez was falling backwards and I guess he fell here.—JUROR MARTÍNEZ ANDINO: Did he fall backwards?—He was falling backwards as I approached and I stopped about ten feet away. I saw the killer and I stopped here. —JUDGE: The fact is recorded that there is a distance of about five feet from the sidewalk and about seven or eight feet from the place where, as reported, Captain Igaravídez fell.—MR. BRANDON: Policeman Miguel Angel Ríos was here behind this post.—JUDGE: A distance of about three feet is measured from a post situated near where Captain Igaravídez is reported to have fallen.—JUROR RAFAEL MAGES: Tell me,. witness, did you say that when the first shot was heard you were standing there?—Yes, sir.—Were you then running this way?—Walking rapidly.—Go back, witness, walk over there and return to this place. (Witness Brandon does as told by juror Mages.)—JUDGE:. Ten seconds are counted by means of a stop watch for covering the distance to where the witness said he had stopped, after he had heard the first shot.—JUROR MAGES: Were there any people at that place?' —I do not remember. I was looking intently at the killer.—Was there anything at that place?—Possibly a carriage. I was looking intently at the killer.—Was the place lighted?—Yes, sir, the place was lighted.—While you were there, did he fire the second shot?— While I was here I saw the aggressor fire the second shot. Between the first and the second shots some time elapsed. It did not sound 'bang, bang' but 'bang . . . bang.'—JUROR JOAQUÍN MARTÍNEZ ANDINO: was this place clear or dark on that night?—There was light.— From these lamps?—There was an electric lamp here in the center which was removed.—Was this corner lighted?—There was lighting

and my eyes were focused on the killer. I immediately recognized the killer.—Were you able to see what happened after the first shot but not before?—Yes, sir, when I heard the shot I saw the man falling, and then I exclaimed: 'a crime!' while I was resting my foot on the small piece of board. Dimas Aromí was sitting near by and could hear me.—Juror Segundo Castro: Did you see the captain coming?—No, sir.—Juror Luis F. Vázquez: When you came running, did you stop there—Yes, sir.—And was the other policeman here?—Yes, sir.—When the second shot was fired?—Yes, sir.—I saw the attitude of the policeman. He showed or expressed the same emotion I was under. He was trembling.—Juror Justo Sánchez Quiles: Which way was the accused coming?—I do not know which way he was coming. I only saw that the accused stood, and was looking this way, that is, towards the victim. I then saw the captain fall. He fell and then the second shot was fired, in a posture like this. (The witness stretches himself down on the sidewalk so as to illustrate graphically his statement).—Juror Mages: Was the policeman there?—The policeman, let us say in this posture; and when the victim fell, he fell in this posture.—Looking which way?—This way. Here, and the cap had fallen behind. He was bald, and his blood oozed out there.—From the left-hand side?—Yes, sir, like this. I then waited until Miguel Rodríguez Alfonso came up and picked up a set of false teeth.—Judge: The jury wanted only to view the place. The court does not wish' to hear any statement as to the facts but only the location of the place.—District Attorney Pierluisi: We are going to request the court that the jury be shown the residence of Captain Igaravídez.—Judge: The jury only wanted to view the place. Now, if he knows where his residence is.—Mr. Brandon: I know where it is.—Which way?—Facing the 'Tell Me' Garage, towards León Street. The house is at the turning of the corner on León Street.—Juror Jenaro Otero: Was Captain Igaravídez lying down here on the ground?—Yes, sir.—Was the second shot fired there?—On the ground.—Did you witness it?—I did.—The second shot?—He was already on the ground when the second shot was fired. "Judge:

"The court desires to record the fact that no other question has been put to the jury. It is twenty-four minutes to one o'clock in the afternoon. That no attorney whatever has yet appeared, and especially neither Attorney Rafael Hernández Matos nor Attorney J. Valldejuly Rodríguez, nor the accused has appeared, notwith-

standing the fact that the court was not advised as to their intention not to appear.

"Now, the view is ended and the court orders the stenographer to transcribe his notes as soon as possible to be made part of the record." (Tr. of Ev., pp. 429–437.)

It may be seen from the above-transcribed report that neither the defendant nor his attorneys appeared in spite of all the opportunities to do so which the court offered them. 'As we have seen, it is alleged by the appellant that a reversal of the judgment lies because the view was taken in the absence of the defendant and his attorneys, and that evidence was heard under such circumstances. The first question that we must decide is as follows: Does the statute recognize in favor of the accused the right to appear at a view, to such an extent that his absence would invalidate the proceedings therein and bring about a reversal of the judgment? On this point the decisions are not unanimous. In a great many jurisdictions it is held that the knowledge of the facts acquired by a jury from a view constitutes evidence, and therefore, a view is a part of the trial and the presence of the accused is indispensable and may not even be waived by him. *Noell* v. *Commonwealth of Virginia,* (1923) 135 Va. 600, 115 N. E. 679, 30 A.L.R. 134, cited by the appellant. Other authorities, no less numerous, headed by the Supreme Court of the United States—*Snyder* v. *Mass., supra*—hold that physical objects observed are not witnesses; that the real purpose of a view is to furnish a means of aiding in the weighing of the evidence, and therefore a view is not a part of the trial; hence the accused is not entitled to be present, similarly as he is not entitled to attend the deliberations of the jury and, consequently, the absence of the accused from the view is not a denial of the due process of law guaranteed by the Fourteenth Amendment to the Constitution. See to the same effect 6 Wigmore on Evidence, 3d ed., p. 252 *et seq.*

It is proper to state here that, although it is true that the opinion in *Snyder* v. *Mass., supra,* delivered by Mr. Jus-

tice Cardozo, held that the accused was not entitled to attend the view in person and that to deprive him of such privilege does not infringe the due process of law guarantee contained in the Fourteenth Amendment to the National Constitution, it is no less true that in the same case, in a dissenting opinion by Justice Roberts and concurred in by Justices Brandeis, Sutherland and Butler, it was declared that a denial of the right of the accused to attend the view is a violation of the provisions of the Fourteenth Amendment, on the ground that what is observed by the jury in a view constitutes evidence in the case, which can not be validly admitted if the accused is personally absent.

It is provided in § 179 of our Code of Criminal Procedure that in a prosecution for felony the defendant must be personally present at the trial. There is no legal provision, however, to the effect that a defendant must personally attend a view, nor that the knowledge acquired by the jury from a view constitutes evidence. Consequently, we must resort to the adjudicated cases in order to determine the question. As there is a decision of the Supreme Court of the United States on the matter, we are bound to follow it and, therefore, we must decide that the accused is not entitled to attend the view in person, and that a view taken in his absence does not violate the constitutional guarantee contained in § 2 of our Organic Act. This does not mean that a court should refuse this privilege to an accused who applies for it. As stated by Wigmore, *supra,* p. 253, it must not be supposed that any judge in ordinary circumstances would deny such privilege to an accused. In this connection, we must reproduce here what we said in *People* v. *Sarria,* 57 P.R.R. 865:

"In our judgment, the better practice is to permit the accused to be present at the view, unless there should exist some reason to the contrary, as, for example, where the life of the accused is in danger if he attends the same. If the accused is present, he may

call the attention of his counsel to any mistake made in pointing out the place or places in question, and may suggest to the latter any spot or place which the jury should inspect.''

Let us take up now the second question to be discussed in connection with the fifth assignment of error, to wit: Did the lower court depart from the prescribed procedure for taking a view, thus prejudicing the substantial rights of the accused to such an extent as to justify a reversal of the judgment and the granting of a new trial? We do not think so. Jorge Brandon who, at the request of the jury, was designated by the court to point out to them the place of the occurrence, had previously testified as a witness for the prosecution and his statement was confined to describing the place where he was when he heard the first shot, the positions of the accused and of the victim, and what the witness was able to see after the first shot was fired, the defendant having cross-examined him at the trial. On getting to the place of the view he was sworn, and he graphically described to the jury the respective positions of the victim and the accused. In other words, he reproduced what he had already testified in this respect, in the presence of the accused and of his attorneys. Nothing was heard from him by the jurors which they had not already heard in the courtroom. Although the time that it took the witness to walk from one point to another at the place of the crime was measured there, and he also stated at the view that the place was lighted, this could not in any way affect the verdict, as it was all quite immaterial. nor could the accused be prejudiced by the fact that the jury saw the location of the house where Igaravídez resided at the time of his death. Moreover, why did the defendant and his attorneys, who are now so much concerned about the former's right, refuse to avail themselves of the opportunity repeatedly offered them by the court to attend the view? We fail to see how in a case where the offense charged was murder in the first degree, where the accused was liable to re-

ceive a life sentence, so much indifference should have been shown by those called upon to look after the rights of the accused. In our judgment any slight departure from the procedure regarding the view did not prejudice the substantial rights of the accused and therefore, we must conclude that the fifth error assigned is nonexistent.

▆▆▆▆ It is stated in the sixth assignment of error that the verdict of murder in the second degree is not supported by the evidence introduced by the prosecution.

As a preliminary question, we must state that the verdict, as required by law, must be based on that portion of the evidence both for the prosecution and for the defense which the jury have believed. Perhaps the evidence for the prosecution might in itself be insufficient; but if the deficiency is supplied by the evidence for the defense, the verdict should not be disturbed on that single ground. In any event we will assume, for the benefit of the accused, that what his counsel meant to allege was that the verdict was against the weight of the evidence.

The prosecuting attorney of this court sets out in his brief a faithful recital of the evidence both for the prosecution and for the defense, and therefore we adopt and transcribe the same as follows:

"The evidence introduced by the district attorney consisted of the testimony of Dr. Alvaro Santaella, Rafael Torruellas Cortada, Carlos Cuesta, Miguel Angel Ríos, Jorge Brandon, Humberto Cartagena, Miguel Alfonso, Eulogio Rivera, Col. Enrique de Orbeta, Judge Jorge Bartolomei, Rafael Molina, Juan M. Tusel, Jorge Rivera, and Capt. Salvador G. López de Azúa. Besides the testimony of the above witnesses there was also introduced in evidence a revolver with four loaded cartridges and two empty shells seized on the person of the accused; a set of false teeth of the deceased and a written note from witness Miguel Alfonso in connection with such inspection evidence; a Colt revolver with 6 loaded cartridges, this being the regulation revolver of Capt. Rafael Igaravídez which was found in the right upper drawer of his desk which was locked; the badge of the policeman and the cap of Capt. Igaravídez; two lead bullets

found on the place of the occurrence immediately after the shots; a man's green handkerchief, two cigars, two special lottery tickets pertaining to the July, 1938, drawing; a watch, a pair of glasses, a box of matches and a checkbook, all of which belonged to Capt. Igaravídez and which he had on his person that night; the vest, the trousers, the shirt and the underwear which the victim was wearing on the night in question; a statement of the charges which Capt. Igaravídez had preferred against the accused for false statements on the same day of the occurrence, at 6 p. m.; and a diagram drawn on a black-board by one of the witnesses for the prosecution. Moreover, the district attorney introduced rebuttal evidence consisting of the testimony of Sgt. José A. Rodríguez and Chief Rafael Molina and Capt. López de Azúa, and a memorandum of the deceased identified by Sgt. Rodríguez and relating to the charges for falsehood filed by the deceased against the accused .

" *     *     *     *     *     *     *

(It appears from such evidence:)

"That defendant Ramón Cruz Reyes at the time of the occurrence, that is, on June 29, 1938, and for several months previously had been stationed as insular policeman in the city of Ponce under the deceased, Capt. Igaravídez; that several days before the occurrence, Capt. Igaravídez had preferred charges against the accused for neglect of duty, consisting in that on June 15, 1938, at 5 p. m., while on day duty on the beat known as 'Atocha & Vives' in the city of Ponce, he was surprised by Chief Igaravídez in conversation with a civilian and in a position contrary to the regulations (Exhibit 10 of the People), on which charge the accused was fined $2 and was reprimanded in a general way; that on said June 15, the defendant entered a report on page 210 of the police blotter at 6:26 p. m., to the effect that at 5:00 p. m. on that same day Antonio Santiago Rodríguez had complained to him that while his car was parked at the corner of Atocha Street they had stolen from the seat of the car a pair of shoes worth $5.50 but that he did not suspect anybody, and that this report turned out to be false, according to an investigation made; that in view of the conduct of the defendant, Capt. Igaravídez filed a new charge of deceit against the accused, of which charge he was notified by serving him with a faithful copy thereof on the same day, July 29, 1938, at 6:00 p. m., 48 hours being allowed him to answer the charge, as prescribed in the Orders and Regulations of the Insular Police; that on that same night, between 8 and 8:30, Capt. Igaravídez left his home in León Street going in the direction of Isabel

Street; that on getting to the latter street he took to the right in a westerly direction, that is, towards Plaza Muñoz Rivera, crossing over in front of the National Printing Press Building from the right to the left sidewalk, diagonally, and going along the latter sidewalk until he reached the corner of Atocha and Isabel Streets in front of the 'Royal' drugstore or pharmacy; that Capt. Igaravídez was walking leisurely smoking a cigar, dressed in his blue uniform of captain of the police force; that when he reached the corner already mentioned, defendant Ramón Cruz Reyes walked up to him and when he reached Capt. Igaravídez saluted and said: 'What is the matter?; that defendant answered by firing a shot at him with his regulation revolver, which shot wounded him in the left pectoral region, the bullet piercing the thorax and the base of the pericardium, the lobe of the left lung, the diaphragm, and the stomach, which organ showed two wounds, one of entry and one of exit, wounding then the spleen and finally emerging through the left aorto-iliac region of the seventh intercostal cavity; that on being thus shot Capt. Igaravídez collapsed and fell on the sidewalk, whereupon the accused got nearer to his victim and fired at his head, the bullet entering the left temporal region and emerging through the right parietal region, fracturing it, and destroying on its passage the temporal and parietal bones and the brain, which resulted in an internal cerebral hemorrhage in the same way that the first wound caused an acute thoracic hemorrhage, from which he died in a few minutes. Once his purpose had been accomplished and having threatened policeman Ríos who tried to approach him at that moment, the defendant got into an automobile with policeman Ríos who arrested and took him to the district jail and took from him a revolver with four loaded cartridges and two empty shells. Capt. Igaravídez was not carrying any weapon with him, as was shown by the evidence for the prosecution, for neither at the place of the occurrence nor afterward when his body was searched by Dr. Picó on instructions from Municipal Judge Bartolomei, was any weapon found on his person, not even a holster, the evidence also showing that Capt. Igaravídez as a rule did not carry a revolver, which fact was proven when his regulation revolver was found by Col. Enrique de Orbeta, Chief of the Insular Police, in one of the locked drawers of his desk in the police station; that from the spot where Capt. Igaravídez fell in a pool of blood, about which were found articles of his personal use such as his denture and the cigar he was smoking at the time of the assault, he was carried to a clinic where he died a few minutes afterward.

"The evidence for the defendant consisted of the testimony of the chauffeur of Rafael Torruellas, one of the witnesses for the prosecution, which testimony was introduced for the purpose of impeaching the credibility of his employer; of Miguel Alvarez, one of the defendant's sureties who was commissioned to travel over the island to collect funds to pay for legal assistance and whose testimony tended partly to impeach the credibility or rather to controvert the testimony of Brandon as a witness for the prosecution; of Edelmiro Colón, ex-policeman, against whom Capt. Igaravídez on one occasion filed charges for disobeying orders and who as lance corporal was demoted to guardsman and transferred from Ponce to the town of Arroyo, for which reason he resigned; of José A. Rivera, who was the chauffeur of witness Edelmiro Colón; of ex-policeman Angel Tilano Maldonado who was removed from the service by the Police Commission on charges brought against him by Capt. Igaravídez; and of the testimony of accused himself as well as that of Capt. López de Azúa. Such evidence for the defendant tended to show that there had been a quarrel between Capt. Igaravídez and ex-policeman Angel Maldonado on account of certain charges filed against him and of a certain aggressive attitude on the part of Capt. Igaravídez for which reason they challenged each other to a fight; that the above had taken place two days before the death of Igaravídez in the presence of defendant Cruz Reyes; that on the night of the events, while the accused was waiting for an automobile to take him home, he saw Capt. Igaravídez at the corner of the 'Royal' drug store and walked towards that place; that when approaching Igaravídez the latter grabbed him saying: 'Ah, Maldonado,' to which defendant Cruz Reyes replied: 'I am not Maldonado,' whereupon Igaravídez said to him: 'Don't speak to me,' and made a gesture as if to put his hand 'here,' that is, a gesture towards his right abdominal region; that the accused then quickly remembering the incident in the police station when Igaravídez and Maldonado had challenged each other to a fight to the death and connecting that with the remark 'Ah, Maldonado,' and fearing an assault from Igaravídez, then took out his revolver and fired twice at him; that he thought the deceased was armed; that the first shot struck him in the chest and the second shot was fired by the defendant when Igaravídez grabbed defendant's leg." (Paranthetical matter supplied.)

From the facts above set forth it appears that there was no controversy as to the accused having killed Rafael Iga-

ravídez. The discrepancy between the evidence introduced by both parties consisted in that, according to the accused, he had acted in self-defense. The jury weighed the whole evidence and did not believe that of self-defense, since they returned a verdict of murder in the second degree. We fail to see that they erred in thus weighing the evidence. As such evidence fully supports the verdict rendered, it follows that the error assigned is nonexistent.

The appellant urges as his eighth and last assignment of error, that the sentence of 17 years in the penitentiary imposed on him is excessive, and complains that the judge failed to take into consideration the recommendation of clemency from the jury. Putting aside the plea of self-defense, as must necessarily have been done since a verdict of murder in the second degree was returned the rest of the evidence clearly shows that the crime committed was murder in the first degree, punishable with life imprisonment. That the judge took into account the recommendation from the jury is evidenced by the fact that he sentenced him only to 17 years in the penitentiary, whereas the facts of the case justified the maximum penalty which in second degree murder is 30 years in the penitentiary.

As the last error assigned is also nonexistent, for the reasons stated an affirmance of the judgment is proper.